# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **RANDY JONES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **CIV. ACT. NO. 2:06cv780-ID** |
| **v.** | ) |
| | ) |
| **ALABAMA POWER COMPANY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

In this lawsuit, Plaintiff Randy Jones ("Jones"), a Caucasian male, alleges that Defendant Alabama Power Company ("Alabama Power") terminated his employment based upon his race and refused to rehire him in retaliation for complaining of discrimination to the Equal Employment Opportunity Commission ("EEOC"). Jones brings his claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981").

Before the court is Alabama Power's motion for summary judgment. (Doc. No. 11.) The motion is accompanied by a memorandum of law and evidence. (Doc. Nos. 12-13.) Jones filed a memorandum of law and evidence in opposition to Alabama Power's motion. (Doc. Nos. 21-22, 25.) Alabama Power filed a reply. (Doc. No. 23). After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Alabama Power's motion is due to be granted.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-

2

moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-23, 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.


## IV.  FACTS[1]

Jones, a Caucasian male, had worked for Alabama Power for more than two decades when he was fired on September 27, 2005.  For the majority of his tenure, Jones was a local operations lineman.  The circumstances which resulted in Jones' termination are set out at length in the parties' submissions.  Distilled to their essence, the material facts surrounding Jones' discharge are as follows.

In September 2005, during Alabama Power's investigation of an unrelated complaint lodged against Jones, Alabama Power discovered that in the summer of 2005 Jones had reconnected the electric services of an Alabama Power customer without authorization.  At the time, the customer was employed by Jones who operated a lawn care business on the side.  As a result, the customer did not have to pay the $50.00 reconnection fee or the $85.00 deposit.

---

[1] The facts are presented in the light most favorable to Jones.

3

Alabama Power conducted an investigation of the accusation against Jones, as detailed in Alabama Power's memorandum of law and accompanying evidence.  (See Def. Mem. of Law at 6-9); (Investigative Report (Def. Ex. 16).)  The investigative report contains, among other things, a statement from the customer who provided the following information:

> This past summer . . ., we had our power cut off and a red seal put on the meter at our house.  I asked [Jones] for a loan but he actually turned our power back on and changed the color of the seal.  He told me he saved me $135.00 so I don't need to tell anyone he had done that.  He was afraid he would loose [sic] his job.

(Investigative Report at 7.)  During the investigation, Jones admitted that he improperly reconnected the electric services of his then employee.  Jones gave the following statement:

> In May 2005 [customer] called me to tell me that [his] power had been disconnected.  I called Lucious Cobbs [an Alabama Power meter reader] and he confirmed that it had been.  I told Lucious I would get their power back on.  I do not recall discussing Lucious' paperwork with him.  I think I asked Lucious how much money [the customer] needed.  I took [the customer] a check and he was able to pay his bill with that.  I did reconnect [his] power and seal the box with my [gray] seal.  I cannot recall if I told [customer] and his wife that I had saved them $135.00.  I do realize that I reconnected power without the direction of the business office and I know I should not have done that.  I was trying to help one of my employees.

(Id. at 11); (see also Pl. Dep. at 97 (Ex. 1 to Doc. No. 13).)  As explained by Alabama Power, when power is disconnected, a red seal is placed on the meter.  A gray seal is used in other instances, such as when power is restored after disconnection.  (Def. Mem. of Law at 6 (citing Ingram Dep. at 71).)

4

Greg Clemons ("Clemons"), a supervisor in Jones' chain of command and a Caucasian male, reviewed the investigative report, talked to Jones' direct supervisor, decided that Jones' misconduct violated company policy, and fired Jones. (Clemons Dep. at 7, 11, 18-19, 22, 59 (Ex. 2 to Doc. No. 13).) Specifically, Clemons determined that, when Jones reconnected the customer's meter and restored electric services without company authorization, he "tampered with a meter and electric service," an offense punishable by immediate termination, as set out in Alabama Power's discipline policy.[2] (Id. at 22-23, 33).)

That policy provides three levels of disciplinary action prior to termination. In some instances, however, the policy authorizes immediate termination "when an employee commits an infraction so serious that progression through the formal levels of discipline is not warranted." (Def. Ex. 9.) Jones is familiar with Alabama Power's levels of discipline; he received a third level discipline in 2001 and again in 2002.[3] (Pl. Dep. at 70-71, 76-79, 82 (Def. Ex. 1 to Doc. No. 13)); (Defs. Exs. 11-13).) In particular, as documented in a company memorandum to all employees, dated May 1, 2000, Alabama Power "clarified the guidelines for two policies." (Def. Ex. 10.) Of relevance, Alabama Power "clarified the reasons for discharge" in its Non-Punitive Discipline Policy by

---

[2] Strangely, the name of the policy which led to the demise of Jones' job is called the "Non-Punitive Discipline Policy" (hereafter also "policy").

[3] On a positive note, Jones received a Top Performer Award in 2004. (Pl. Mem. at 2.)

5

adding "a non-inclusive list of actions that will result in immediate discharge," including "[t]ampering with an electric service account or meter."  (Id.)

Emphasizing the seriousness of tampering with a meter, Alabama Power also submits an undated memorandum from Alabama Power's then executive vice president. In that memorandum, he explains that "[t]he number of thefts of electric service/current has been increasing at an alarming rate throughout the electric industry."  (Id.)  He further warns that any employee

> found to be receiving or assisting others in receiving electric service by any type of unauthorized use, diversion, or reconnection or found to have tampered with or bypassed or assisted others in tampering or bypassing the Company's electric meters or wires so that such meters do not register the correct amount of electricity used will be subject to discharge.

(Id.)

Jones admits that he reconnected the customer's electric services "without securing a work order before doing so," but he denies that his misconduct constituted tampering with a meter.  (Compl. ¶ 7); (see also Pl. Mem. of Law at 4 (conceding that Jones reconnected the meter "without a work order, a violation of company policy"); (Pl. Dep. at 90, 105.)  He also contends that Lucious Cobbs ("Cobbs"), an African-American male, committed an "offense[] of equal or greater seriousness," but was not fired.  (Pl. Mem. of Law at 7); (Compl. ¶ 7.)  A discussion of the facts surrounding Cobbs' infraction, thus, is helpful.

Cobbs, an Alabama Power meter reader, disconnected the electric services of the customer at issue and wrote the work order directing disconnection and requiring an

$85.00 deposit for restoration of services.[4]  After he cut off the electric services, Cobbs says that Jones called him and said that he "would go back and reconnect [the power] and take care of the entire bill." (Cobbs Dep. at 23-29 (Pl. Ex. 6 to Doc. No. 22).)  Cobbs, thus, erased the meter reading on the work order to prevent the business office from sending a lineman to reconnect the meter after the account balance was paid.  (Id. at 28-29.)

By erasing the meter reading on the order, Cobbs altered company documents. (Weaver Dep. at 20-23, 66 (Pl. Ex. 4 to Doc. No. 22).)  As a consequence, his supervisor, Terry Weaver ("Weaver"), placed Cobbs on "third level discipline" for a period of eighteen months.  (Def. Ex. 31.)  The third level is the most serious level of discipline short of termination.  (Def. Ex. 9.)  It is authorized when either "an employee does not meet a commitment to improve during the period of a Second Level Notice, or when a single infraction is serious enough to warrant this level of discipline."  (Def. Ex. 9.)  If any performance problems arise during the time period that the third level discipline is in effect, "discharge will be recommended."  (Id.)

Weaver determined that, although Cobbs had committed a single infraction, his conduct was sufficiently serious to warrant a third level discipline.  Weaver explained that he made his disciplinary decision after he interviewed Cobbs, reviewed other investigative information provided to him and assessed the "circumstances." (Weaver

---

[4] The deposit amount required to restore power after a disconnection varies depending on, among other things, the customer's credit and payment history. (Clemons Dep. at 28, 36.)

Dep. at 10-13, 18-19, 61.)  He examined whether Cobbs had obtained "any kind of personal benefit or gain" by altering the document and whether Cobbs "had a relationship or an awareness or an association with the individual's account that had been reconnected."  (Id.)  These inquiries were answered in the negative and, thus, weighed in Cobbs' favor.  (Id. at 61-62, 65-66.)  Weaver also "took into consideration [Cobbs'] previous [positive] job performance."  (Id. at 61, 65-66); (Cobbs Dep. at 34 (Pl. Ex. 6 to Doc. No. 22).)

After his termination, Jones sent two unverified letters to the EEOC complaining that Alabama Power fired him on the basis of his race.  (Def. Exs. 23, 27.)  The letters are dated March 20, 2006, and April 7, 2006.  (Id.)  On June 5, 2006, the EEOC mailed Jones a notice of right to sue.  (Def. Ex. 30.)

In July 2006, Jones completed an online profile on the careers website of Southern Company Services ("Southern Company"), which is Alabama Power's parent company. Jones selected "Technician/Occupational - Lineman" as the field of jobs in which he would be interested in applying.  As explained by J Robert Sunderland ("Sunderland"), Southern Company's talent acquisition operations team leader, when an individual creates an online profile and selects a job field of interest, he is not applying for a specific position, but rather is ensuring that he will receive notification via e-mail if a job within the field he has selected becomes available.  After notification of an opening, the individual then can complete and submit an application online.  Sunderland confirms that, while Jones created an online profile, he has not applied for a vacant position within Alabama Power or Southern Company since his termination in September 2005.

8

(Sunderland Aff. & Ex. C attached thereto (Def. Ex. 32).)  Sunderland also explains that,

if Jones had applied for a job, the position for which he submitted an application would

be listed on his "job submissions candidate tab" on the careers website.  (Sunderland Aff.

¶ 5.)

Seeking relief for Alabama Power's alleged transgressions, on August 30, 2006,

Jones filed the instant lawsuit pursuant to Title VII and § 1981.[5]  In Count I of his two-

count complaint, Jones alleges a wrongful termination claim.  In Count II, Jones avers

that he "reapplied for employment" with Alabama Power, but Alabama Power refused to

rehire him in retaliation for complaining of discrimination to the EEOC.  (Compl. ¶ 12.)

Jones requests a declaratory judgment, a permanent injunction, "back-pay (plus interest),

compensatory and punitive damages, reinstatement, or in lieu of reinstatement[,] front

pay[,]" costs and attorney's fees.  (Id. at 4.)


## V.  DISCUSSION

Jones concedes that this is not a direct evidence case.  (See Pl. Mem. of Law at 6

(Doc. No. 21).)  Consequently, his Title VII/§ 1981 discrimination and retaliation claims

---

[5] The court notes that, approximately eleven months after Jones filed this lawsuit, on July 25, 2007, Jones filed an "amended verified charge" with the EEOC, outlining in further detail his wrongful termination claim against Alabama Power.  The "amended verified charge" is signed by Jones "under penalty of perjury[.]"  (Pl. Ex. 21 (Doc. No. Ex. to Doc. No. 22.)

are governed by the familiar <u>McDonnell Douglas</u> burden-shifting framework.[6]
<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  In the first <u>McDonnell
Douglas</u> phase, the employee must produce evidence sufficient to make out a prima facie
case, thus giving rise to a presumption that the employer unlawfully discriminated or
retaliated against him in taking the alleged adverse employment action.  <u>See</u> <u>St. Mary's
Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993).

Next, the employer must rebut this presumption by producing evidence that the
negative employment action was motivated instead by a legitimate, nondiscriminatory or
non-retaliatory reason.  <u>Id.</u> at 509.  The employer's "burden is one of production, not
persuasion; 'it can involve no credibility assessment.'"  <u>Reeves v. Sanderson Plumbing
Prods., Inc.</u>, 530 U.S. 133, 142 (2000) (quoting <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 509).
Finally, to avoid summary judgment, the plaintiff must respond with evidence, which
may include previously produced evidence establishing a prima facie case, which would
allow a reasonable jury to conclude that the reasons given by the employer were not the

_____

[6] "The <u>McDonnell Douglas</u> scheme for the allocation of burdens and the order of
presentation of proof also applies in § 1981 cases involving discriminatory treatment in
employment situations."  <u>Turnes v. AmSouth Bank</u>, 36 F.3d 1057, 1060 (11th Cir. 1994).
In <u>Adams v. Cobb County School District</u>, the Eleventh Circuit noted that "'whether the
elements of Title VII and § 1981 retaliation claims are the same is an open question in
this Circuit.'"  No. 06-15103, 2007 WL 1720430, *4 n.6 (11th Cir. June 15, 2007)
(quoting <u>Bass v. Bd. of County Comm'rs</u>, 256 F.3d 1095, 1120 n.10 (11th Cir. 2001)).  As
in <u>Adams</u>, however, because the parties have not raised this "open question," the court
assumes without deciding that the elements of a Title VII retaliation claim also apply to a
§ 1981 retaliation claim.  <u>See</u> <u>id.</u>  The court, thus, considers the discrimination and
retaliation claims – and the proof relating to them – under the Title VII burden-shifting
framework.

real reasons for the adverse employment decision.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997); see also Reeves, 530 U.S. at 143.  "The result of this three step dance is that the burden is always on plaintiff to show that defendant's action is discriminatory."  Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1081 (11th Cir. 2005) (per curiam).

### A.  Wrongful Termination (Count I)

Alabama Power argues that Jones cannot establish a prima facie case of racial discrimination.  Alternatively, Alabama Power contends that Jones cannot rebut the legitimate, nondiscriminatory reason for terminating him.

Attacking Jones' prima facie case, Alabama Power asserts that Jones has not demonstrated that he was treated less favorably than similarly-situated employees who are not Caucasian.  Jones disagrees, asserting that Cobbs is a proper comparator.  Alternatively, Jones argues that, even absent evidence that Alabama Power treated a similarly-situated employee of another race more favorably, he has demonstrated a prima facie case of discrimination because he has "put forth substantial evidence" that his admitted misconduct does not equate the terminable offense of tampering with a meter. (Pl. Mem. of Law at 8 (Doc. No. 21) (citing Jones v. Gerwens ("Gerwens"), 874 F.2d 1534 (11th Cir. 1989).)

The Eleventh Circuit's opinion in Jones v. Bessemer Carraway Medical Center ("Bessemer") readily disposes of Jones' second argument.  There, the plaintiff called the

11

court's attention to the same language in <u>Gerwens</u> upon which Jones relies.  137 F.3d 1306, 1311 n.6 (11th Cir.), <u>modified on other grounds on denial of reh'rg</u>, 151 F.3d 1321 (11th Cir. 1998).  The <u>Bessemer</u> court explained that the discourse in <u>Gerwens</u> about "'did not violate the work rule'" was dictum.  <u>Id.</u>  The court held that <u>Gerwens</u> requires a plaintiff who alleges racial bias in discipline stemming from work rule violations to demonstrate not two, but three, prima facie elements:  (1) that he is a member of a protected class; (2) that he "has engaged – either (a) disputedly or (b) admittedly – in misconduct similar to persons outside the protected class"; and (3) "that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment."  <u>Id.</u>  The <u>Bessemer</u> court

> stress[ed] that, under the [<u>Gerwens</u>] formulation, no plaintiff can make out
> a prima facie case by showing just that she belongs to a protected class and
> that she did not violate her employer's work rule.  The plaintiff must also
> point to someone similarly situated (but outside the protected class) who
> disputed a violation of the rule and who was, in fact, treated better.

<u>Id.</u>

Based upon the clear command of <u>Bessemer</u>, this court rejects Jones' interpretation of <u>Gerwens</u>.  Jones cannot establish a prima facie case simply by denying that he violated the work rule at issue.

Turning to the similarly-situated requirement of the <u>Bessemer</u> prima facie case, Jones bears the burden of demonstrating that he was treated differently than Cobbs.  To carry this burden, Jones must show that Cobbs was "similarly situated in all relevant respects."  <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997).  Although Cobbs

need not be "identically situated" to Jones, id., the "quantity and quality of the

comparator's misconduct [must] be nearly identical to prevent courts from

second-guessing employers' reasonable decisions and confusing apples with oranges."[7]

Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999); see also Silvera v. Orange

County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).  For purposes of the prima facie

showing, "[t]he most important factors in the disciplinary context are the nature of the

offenses committed and the nature of the punishments imposed."  Maniccia, 171 F.3d

at 1368.  Moreover, although not always dispositive, failure to show a common

supervisor can be a strong factor against a finding that employees are similarly situated.

See Anderson v. WBMG-42, 253 F.3d 561, 566 (11th Cir. 2001); Silvera, 244 F.3d

at 1261 n.5 (noting that "differences in treatment by different supervisors or decision

makers can seldom be the basis for a viable claim of discrimination") (citing, among other

decisions, Gerwens, 874 F.2d at 1541); Chapman v. AI Trans., 229 F.3d 1012, 1031 n.21

---

[7] In Burke-Fowler v. Orange County, Florida, the Eleventh Circuit observed that a prior panel "called into question" the "nearly identical" requirement.  447 F.3d 1319, 1323 n.2 (11th Cir. 2006) (citing Alexander v. Fulton County, 207 F.3d 1303, 1334 (11th Cir. 2000)).  The Eleventh Circuit in Burke-Fowler, however, noted that it was "bound to follow Maniccia's 'nearly identical' standard rather than the standard articulated in Alexander because when a later panel decision contradicts an earlier one, the earlier panel decision controls."  Id. (citing Walker v. Mortham, 158 F.3d 1177, 1188-89 (11th Cir. 1998)); see also Eggleston v. Bieluch, 203 Fed. Appx. 257, n.5 (11th Cir. 2006) (holding that Burke clarified the "confusion in the law of this circuit about the degree of similarity necessary for a valid comparator").  Herein, the court has applied the "nearly identical" standard, but notes that its findings would be the same even under the less stringent standard set forth in Alexander, *supra*.

(11th Cir. 2000) ("Different decision-makers are entitled to be concerned about different things.").

Moreover, in conducting the comparator analysis, a court must remain mindful that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules[.]"  Silvera, 244 F.3d at 1369 (internal quotations omitted).  For this reason, the employer's perception as to the severity of the employee's conduct is relevant in determining whether the employee and the comparator are similarly situated in all relevant respects.  See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1186 (11th Cir. 1984) (explaining that if an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown).  When the plaintiff and the proposed comparator are not similarly situated, the employer's decision to impose different punishment on each does not raise an inference of illegal discrimination.  See Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999).

As stated, Jones points to Cobbs whose discipline fell short of termination.  For the reasons to follow, however, the court finds that Jones and Cobbs are not similarly situated in all relevant respects.

By virtue of their different jobs, Jones and Cobbs were under different supervisory regimes.[8]  Weaver made the decision to discipline Cobbs.  Clemons made the decision to terminate Jones.  (Clemons Dep. at 11, 18, 64-66, 75); (Weaver Dep. at 10.)

---

[8]  Cobbs was a meter reader; Jones was a local operations lineman.

14

Alabama Power has submitted evidence that Clemons was not in Cobbs' supervisory chain of command and did not have any influence or say regarding the discipline imposed against Cobbs.  (Clemons Dep. at 39, 64, 66, 75.)  Similarly, Weaver had no involvement in or "control over" the decision to terminate Jones.  (Weaver Dep. at 13-18.)  Jones presents no evidence to the contrary.  Different decisionmakers, thus, made the disciplinary decisions at issue.

Although Jones' and Cobbs' misconduct arose from the same incident, the court finds that there are factual differences, both actual and perceived, in the roles Jones and Cobbs played in the incident.  Jones reconnected a meter without company authorization; Cobbs altered a meter reading on a work order directing disconnection of a customer's electric services for non-payment.  Clemons viewed the circumstances surrounding Jones' conduct as warranting termination.  Weaver also perceived Cobbs' infraction to be "serious enough" to bypass the first two levels in Alabama Power's three-level disciplinary progression.  Weaver, though, did not consider termination as required because Cobbs did not receive any personal benefit from altering the meter reading on the work order, did not have a personal relationship with the customer and had no significant performance problems.  (Weaver Dep. at 18-19, 61-62, 65-66); (Doc. No. 9.)

While Weaver was not involved in the decision to terminate Jones, it is notable that the mitigating facts Weaver considered distinguish Cobbs' conduct from Jones' conduct.  The investigative report upon which Clemons relied in terminating Jones reveals that Jones knew the customer at issue, wanted to help that customer and, in fact,

saved the customer money owed to Alabama Power by reconnecting the customer's

electric services without authorization.  At the same time, it can be inferred that, because

the customer had requested a loan from Jones to pay the delinquent account, Jones

averted having to lend the customer the entire balance.  (Investigative Report at 7, 11.)

The investigative report further indicates that Jones had received a prior third level

discipline in 2002.  (Id. at 12.)

While Jones says in conclusory fashion that Cobbs "engaged in far more serious

conduct" than Jones, (Pl. Mem. of Law at 9), he has not demonstrated that Weaver's and

Clemons' differing perceptions of the severity of their subordinates' conduct give rise to

an inference of discrimination.  He fails to cite any evidence indicating that Weaver did

not have discretion to choose a third level discipline in lieu of termination as a sanction

for Cobbs' misconduct.  (See, e.g., Weaver Dep. at 22.)  Jones also has not pointed to any

non-Caucasian employee who under circumstances similar to his was not terminated after

reconnecting a meter without company authorization.[9]

In sum, the court finds that the fact that different supervisors made the disciplinary

decisions based upon their independent assessment of the severity of the dissimilar

misconduct sufficiently explains the disparity in discipline, thereby preventing an

inference of discrimination.  Jones has not raised a genuine issue of material fact that the

---

[9]  It also is noteworthy that Clemons and Jones are both Caucasian, yet another factor which weakens Jones' argument of discrimination.  See Moore v. Ala. Dep't of Corr., 137 Fed. Appx. 235, 239 n.4 (11th Cir. 2005) ("Where decision-makers are also members of a protected class, the plaintiff faces a greater burden.") (citing Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1467 (11th Cir. 1991)).

relevant decisionmaker who reviewed the accusation against him meted out a punishment against Jones for racial reasons.  Jones, therefore, fails to establish a prima facie case of discrimination.

Assuming though that Jones had established a prima facie case, the court finds that Alabama Power has "clearly set forth, through the introduction of admissible evidence" a legitimate, nondiscriminatory reason for Jones' termination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981).  Namely, Clemons believed that the circumstances under which Jones reconnected a customer's meter without an order qualified as tampering with a meter, in violation of a specific company policy which warranted termination.  (Def. Mem. of Law at 10, citing Def. Ex. 10 and Clemons Dep. at 22, 33)); Nix, 738 F.2d at 1187 (holding an employee may be fired "for good reason, bad reason, reason based on erroneous facts, or no reason at all, so long as its action is not for a discriminatory reason").

In this case, the pretext inquiry focuses on Clemons' perception of the facts available to him at the time of the decision, rather than on Jones' beliefs, Holifield, 115 F.3d at 1565, and on whether Clemons honestly believed that those facts violated the stated work rule.  Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1220 (10th Cir. 2007) ("A pretext argument requires the court to 'examine the facts as they appear to the person making the decision,' to determine whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'") (citation omitted).  Jones cannot show

pretext merely by "quarreling with the wisdom" of his employer's reason.  Chapman, 229
F.3d at 1030.

Jones does not dispute that he "reconnected [a customer's] meter without a work
order, a violation of company policy."  (Pl. Mem. of Law at 4 (citing Pl. Dep. at 105).)
He also does not dispute that Alabama Power's Non-Punitive Discipline Policy provides
that "[t]ampering with an electric service account or meter" is an offense that "will result
in immediate termination."  (Def. Ex. 10.)  Rather, Jones argues that his misconduct does
not equate "tampering with a meter" and that, while his conduct "violated company
policy," Alabama Power "cannot fire him for this violation."  (Pl. Mem. of Law at 8.)

Having carefully considered the evidence upon which Jones relies to show pretext
(see id.) and Alabama Power's rebuttal (see Def. Reply at 5-8), the court finds that Jones
has not submitted any competent evidence that Alabama Power interpreted or applied its
policy forbidding tampering with a meter in inconsistent ways or that Clemons' belief
that the policy applied to Jones' conduct was not honest.  See, e.g., Dawson v. Henry
County Police Dep't, 238 Fed. Appx. 545, at **3 (11th Cir. 2007) (holding that plaintiff
failed to raise a triable pretext issue because he merely "questioned whether his
employment acts constituted violations of work rules and state law as claimed by
[employer]," but "introduced no evidence to show that [employer] had no real belief that
his acts were improper and merited the discipline imposed").  In the end, at best, Jones
disagrees with Alabama Power's application of the policy to his conduct.  Absent any
evidence that Alabama Power selectively enforced its policy in a racially discriminatory

manner, the court will not and cannot "second-guess the wisdom of an employer's decisions[.]"  Alexander, 207 F.3d at 1341.  The court, therefore, finds that Jones has failed to show a genuine issue of material fact regarding pretext.  Accordingly, Alabama Power's motion for summary judgment on Jones' wrongful termination claim is due to be granted.


### B.  Retaliation (Count II)

Jones also brings a retaliation claim under Title VII and § 1981, alleging that Alabama Power took an adverse employment action against him by not rehiring him in retaliation for exercising his statutory right to complain to the EEOC about race discrimination.[10]  (Pl. Mem. of Law at 14 (Doc. No. 21).)

To establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in statutorily protected activity, (2) that he suffered an adverse employment action and (3) that the adverse employment action was causally related to the protected activity.  Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998).  In this case, element two is at issue.

---

[10] Section 1981 "prohibits an employer from retaliating against its employee as a response to the employee's complaint of race-based discrimination."  Adams, 2007 WL 1720430, at *4 n.6.  Title VII's anti-retaliation provision, codified at 42 U.S.C. § 2000e-3, "forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge . . . in' a Title VII 'investigation, proceeding, or hearing.'"  Burlington Northern & Santa Fe Ry. v. White, ___ U.S. ___, ___ 126 S.Ct 2405, 2416 (2006) (quoting 42 U.S.C. § 2000e-3).

Alabama Power asserts that Jones' retaliation claim fails for the simple reason that, after terminating Jones, Alabama Power has not posted a job opening for which he applied; therefore, Alabama Power argues that it has not taken any action against Jones, much less an adverse action.  (Def. Mem. of Law at 24 (Doc. No. 12)); (Def. Reply at 8.) (Doc. No. 23).)  For the reasons to follow, the court agrees with Alabama Power.

The court finds instructive the First Circuit's guidance in Velez v. Janssen Ortho, LLC, 467 F.3d 802 (1st Cir. 2006).  In Velez, the court stated,

> In the retaliatory failure-to-hire context, the specifics of the job application or applications that underlie a claim of failure-to-hire usually relate most naturally to the adverse employment action prong of such a claim.  Put most simply, in the absence of a job application, there cannot be a failure-to-hire.

Id. at 807.  Relying on precedents from other circuits, the First Circuit held that, in a retaliatory failure-to-hire case, to demonstrate an adverse employment action, a plaintiff must demonstrate that (1) he or she "applied for a particular position (2) which was vacant and (3) for which [he or] she was qualified" and further that (4) he or she "was not hired for that position."  Id.

Pursuant to Velez, the issue is whether Jones has demonstrated that he applied for an open position.  He has not.  Alabama Power submits an affidavit from Sunderland which establishes that the document upon which Jones relies to show that he has not been rehired merely indicates that Jones created a job profile and uploaded his resume on Southern Company's careers website.  (Sunderland Aff. (Def. Ex. 32)); (Pl. Mem of Law at 14 (relying on Pl. Ex. 16).)  As explained by Sunderland, when Jones created this online profile, Jones did not apply for a particular job, but merely ensured that he would

20

receive notification via e-mail of any job opening which satisfied the criteria he had selected.  Sunderland states explicitly that Jones has not applied for any position with Alabama Power or its parent company.  (See Sunderland Aff. (Def. Ex. 32).)  Sunderland's affidavit is unrefuted.

Because Jones never applied for any vacant position, it is impossible to infer that his application was rejected.  Absent any evidence that Jones suffered an adverse employment action, his retaliation claim fails.  Summary judgment, therefore, is due to be entered in favor of Alabama Power on Jones' retaliation claim.[11]

## VI.  ORDER

Accordingly, it is CONSIDERED and ORDERED that Alabama Power's motion for summary judgment be and the same is hereby GRANTED.

A final judgment shall be entered separately.

Done this 14th day of November, 2007.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE

---

[11] Alabama Power also argues that it is entitled to summary judgment on Jones' Title VII claims because Jones did not timely verify his EEOC charge.  (Def. Mem. of Law at 12-14); 29 C.F.R. § 1601.9 (2007) (providing that a charge "shall be in writing and signed and shall be verified").  Based upon the findings herein, the court need not, and declines, to reach this issue.